IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VICKY L. PETERSON,<br><br>    Plaintiff,<br><br><br><br>      vs.<br><br><br><br>MICHAEL J. ASTRUE, Commissioner of the Social Security Administration,<br><br>    Defendant. | ORDER AFFIRMING COMMISSIONER'S DECISION<br><br><br><br><br><br>Case No. 2:06-CV-00881 PGC<br><br>Judge Paul G. Cassell |

The plaintiff, Ms. Vicky Peterson, brings this action for the court to review the Social Security Administration Commissioner's denial of her application for disability and social security insurance benefits under Title II of the Social Security Act,[1] for the period of November 1, 2000 to June 28, 2002.  Ms. Peterson argues the administrative law judge (ALJ) improperly discounted the opinions of two physicians, improperly evaluated Ms. Peterson's credibility, wrongly determined her residual functional capacity determination, and erroneously concluded sufficient jobs existed in the national economy for Ms. Peterson.  The Commissioner counters

---

[1] 42 U.S.C. § 405(g).

that the ALJ properly considered these issues.

The court finds the ALJ applied the correct legal standards and substantial evidence supports his decision to deny Ms. Peterson disability and social security insurance benefits. Therefore, the court affirms the Commissioner's decision and denies Ms. Peterson's motion.

## FACTS AND FINDINGS

For purposes of this appeal, the court finds the following facts.

1.    *General Background*

Ms. Peterson was born in 1951. She has completed high school and one year of college. In the past, she worked as a receptionist, secretary, accounts payable clerk, and cashier. Ms. Peterson claims that on January 12, 1999, she became disabled, due to depression, back pain, and hip pain.

In 1995, Brent Prately, M.D., diagnosed Ms. Peterson with chronic back strain and associated problems. He restricted her from repetitive lifting or bending at work, limited her to lifting fifteen pounds, and recommended she change position frequently.

On February 1, 2001, Gary Nelson, PA-C, assessed Ms. Peterson's complaints of chronic back and leg pain, indicating that Ms. Peterson would be unable to sit or stand for long periods. Ms. Peterson requested that Mr. Nelson complete a disability form for her. Mr. Nelson refused to do so without reviewing her medical reports. An x-ray of Ms. Peterson's knee from February 20, 2001, revealed normal results, with no fractures, dislocation, or effusion. On February 27, 2001, Mr. Nelson reported that Ms. Peterson's knee x-rays were essentially normal, but he referred her to Ralph McDonald, M.D., for a follow-up.

On March 3, 2001, Brian Staley, M.D., performed a neurological evaluation of Ms. Peterson.  Dr. Staley found her examination and oral history to be consistent with a finding of degenerative disc disease of the lumbar spine.  He found no nerve root impingement, but noted that Ms. Peterson needed to use a supportive device to walk.  Dr. Staley concluded Ms. Peterson's right hip pain was most likely referred pain from her lumbar spine.  Dr. Staley also observed that Ms. Peterson was "well-kept," suffered no acute distress, was alert and oriented (with no evidence of a thought or mood disorder), with intact memory and concentration.[2]

In March 2001, Ms. Peterson presented to Dr. McDonald for her follow-up, with complaints of hip and back pain.  An April 1, 2001, MRI of Ms. Peterson's left knee revealed a tear and degenerative changes.  On April 10, 2001, Dr. McDonald indicated the MRI of Ms. Peterson's knee revealed extensive problems.  He ultimately opined that Ms. Peterson's condition left her unable to work and that she would need surgery and rehabilitation to improve.

At LDS Hospital, on April 23, 2001, Ms. Peterson was seen for right hip and knee pain. A radiology report showed her right knee to be essentially normal (minimal abnormalities) and x-rays of her hips and pelvis were normal.  A May 2001 MRI of the same knee revealed joint fluid, a tear, and mild joint irregularity.  Also in May 2001, Craig McQueen, M.D., reported that Ms. Peterson's knee showed early degenerative change and patellofemoral misalignment.  He recommended Ms. Peterson participate in an exercise program.  Dr. McQueen agreed with Dr. McDonald's assessment that Ms. Peterson would be unable to work due to her knee problems.

---

[2] R. 263.

Dr. McQueen found Ms. Peterson had lateral patellar compression syndrome and synovitis.

Medical reports from September 25, 2001, indicate Ms. Peterson had been diagnosed with chronic lower extremity pain, plantar fasciitis, midtarsal pronation, and a heel spur.  At the Tanner Clinic, Ms. Peterson was provided with orthopedic appliances and told to do stretching exercises.  She was similarly diagnosed on October 10, 2001, at which time she indicated her pain had improved a little.  At this visit, she refused a steroid injection.

Ms. Peterson returned to Tanner Clinic on January 16, 2002, complaining of knee, hip, and foot pain.  X-rays of Ms. Peterson's knees showed that she suffered from mild degeneration and minimal narrowing of the medial compartment, although it was noted that Dr. McDonald had previously reported that Ms. Peterson suffered from significant knee problems.  Charles Bean, M.D., recommended Ms. Peterson receive anti-inflammatory injections and braces, and that she undergo physical therapy and, if there was no improvement, arthroscopic surgery.  On January 30, 2002, Ms. Peterson was fitted with orthopedic appliances, with she said were "very comfortable."[3]  On June 16, 2002, Ms. Peterson returned to Tanner Clinic after falling down.  X-rays showed unremarkable results — only early degenerative disease and minimal narrowing of the medial compartment.

In a letter dated July 29, 2002, Dr. Bean recommended that Ms. Peterson move closer to her family because she was finding it progressively difficult to function alone in Salt Lake City.  Then, on October 30, 2002, Dr. Bean authorized the purchase of a cane for Ms. Peterson.

---

[3] *Id.* at 458.

In October 2001, a physician with Disability Determination Services completed a residual functional capacity assessment of Ms. Peterson's physical state. He determined her primary diagnosis involved degenerative knee disease and her secondary diagnosis was a tear in her right knee. The physician noted Ms. Peterson had the ability to: occasionally lift and/or carry ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; balance frequently; and occasionally climb, stoop, kneel, crawl, and crouch. Ms. Peterson was found to have no manipulative, visual, communicative, or environmental limitations.

Physicians at Disability Determination Services completed a residual functional capacity assessment on Ms. Peterson again on October 15, 2002. At this time, they primarily diagnosed her with degenerative disease of the lumbar spine and secondarily diagnosed her with degenerative joint disease of the knees. Ms. Peterson was found to have the ability to: occasionally lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; push and/or pull without limitation; and occasionally climb, balance, stoop, kneel, crouch, and crawl. Ms. Peterson was again found to have no manipulative, visual, communicative, or environmental limitations.

During this same time period, Ms. Peterson sought some mental health care. She was first seen at Valley Mental Health, complaining of stress due to working in a "hostile environment." Sandra Allred, R.N., determined that Ms. Peterson's mental systems were normal, although Ms. Peterson seemed anxious and tearful. Ms. Allred found no psychiatric evaluation to be necessary. On January 21, 1999, after several requests by Ms. Peterson, Charlotte Grant,

M.D., performed a psychiatric evaluation of Ms. Peterson.  Dr. Grant diagnosed Ms. Peterson

with an adjustment disorder with disturbance of emotions.  She recommended that Ms. Peterson

take anti-anxiety medication and pursue therapy with Nurse Allred.  Then, on January 28, 1999,

Nurse Allred indicated that she had "reviewed old chart information" and found that Ms.

Peterson had been "quite dishonest during assessment . . . concerning past history."[4]

On April 14, 1999, Valley Mental Health records indicated that Ms. Peterson had been

laid off at both of her new jobs.  Also, on May 20, 1999, Ms. Peterson admitted she had not

searched for a new job, and that she was being argumentative with people.  On June 3, 1999, Ms.

Peterson reported that she cried a lot, and generally had difficulty coping and functioning.  Ms.

Peterson claimed she felt overwhelmed and out of control.  She indicated she slept poorly and

she seemed paranoid.  But Ms. Peterson also admitted she had stopped taking her medication.

She was found to be suffering from an adjustment disorder and, possibly, depression.

On August 31, 1999, Marilyn Little, APRN, indicated Ms. Peterson suffered from major

depression with psychotic features.  In a letter dated September 1, 1999, Ms. Little concluded

Ms. Peterson would be unable to work and, at times, unable to perform activities of daily living

without help.  Further, Ms. Little found Ms. Peterson to have difficulty focusing and

concentrating due to depression.  Ms. Little also indicated Ms. Peterson would benefit from

participating in vocational rehabilitation.

Liz McGill, Ph.D. performed a psychological examination of Ms. Peterson on November

---

[4] *Id.* at 224.

4, 1999.  Ms. Peterson admitted she was being seen at a substance abuse facility.  She acted

evasively, but acknowledged she "drank a lot" over the past couple of years.[5]  Ms. Peterson was

also evasive when asked about her work history and refused to provide much information.  She

did admit to managing her own money, shopping, cooking, and cleaning with her live-in

boyfriend.  Dr. McGill determined that Ms. Peterson was "very uncooperative and did put forth

much effort into presenting herself as disabled."[6]  Despite this, Dr. McGill found Ms. Peterson's

mental status to be largely normal.  Dr. McGill concluded that although Ms. Peterson exhibited

memory problems, "her lack of response seem[ed] more tied to her lack of cooperation."[7]  Dr.

McGill also noted that Ms. Peterson's performance on the mental status examination was one of

the "worst" her office had ever seen, and that Ms. Peterson would answer "no" to almost any

question.[8]  Ultimately, Ms. McGill opined that Ms. Peterson was malingering, and suffered from

alcohol abuse and a personality disorder.

On March 30, 2000, Ms. Little again noted that Ms. Peterson was suffering from

depression, with difficulty focusing, concentrating, and completing daily tasks.  However, Ms.

Little acknowledged she had not examined Ms. Peterson since June 1999, prior to original

medical report.  In other words, this report was based on that same examination.

Progress notes from Valley Mental Health on December 19, 2000, indicate Ms. Peterson

---

[5] *Id.* at 233.

[6] *Id.* at 234.

[7] *Id.*

[8] *Id.* at 235.

was diagnosed with major depression and a need to rule out dependent personality disorder.

Then, on December 29, 2000, Ms. Little diagnosed Ms. Peterson with post traumatic stress

disorder and major depressive disorder.  Reports from February 2001 indicate Ms. Peterson had

threatened suicide.

On December 19, 2000, Ms. Peterson returned to Valley Mental Health, complaining of

depression and asking to return to taking her medications.  On January 4, 2001, Deborah Bilder,

M.D., performed a psychiatric evaluation of Ms. Peterson.  Ms. Peterson claimed she was

depressed due to a divorce and a pending eviction.  Dr. Bilder found Ms. Peterson to be

cooperative and noted she exhibited no agitation or retardation; she had normal speech; her

thought process was directed; she denied hallucinations and delusions; she was alert and

oriented; her immediate and recent memory was intact; and she exhibited poor judgment but fair

insight.  Dr. Bilder also noted Ms. Peterson's history of noncompliance, but indicated that she

would start Ms. Peterson on Prozac.  Dr. Bilder opined that if Ms. Peterson were "willing to take

medications and play an active role in her treatment, she ha[d] a reasonable chance of responding

[to treatment]."[9]

Ms. Peterson's mental health records show that she had not taken her prescribed

medication as of January 9, 2001.  On February 14, 2001, Ms. Peterson was noted to have

exhibited "very poor compliance."[10]  On May 17, 2001, Ms. Peterson reported feeling "okay,"

---

[9] *Id.* at 346.

[10] *Id.* at 341.

despite missing more appointments and failing to pick up her medication.[11]  Throughout the rest of 2001, Ms. Peterson continued to miss appointments.

On March 9, 2001, Peter Heinbecker, M.D., performed a psychological examination of Ms. Peterson.  Dr. Heinbecker ultimately diagnosed her with a depressive disorder, alcohol dependence, and a personality disorder.  But Dr. Heinbecker also indicated that Ms. Peterson's lack of cooperation made diagnosis difficult.  And he found Ms. Peterson's memory to be so poor that it was "beyond belief."[12]

On December 10, 2001, a psychological assessment at Davis Behavioral Health culminated in a diagnosis of depressive disorder and psychotic disorder, with a need to rule out a bipolar disorder and personality disorder.  In records from the facility dated September 11, 2002, it was noted that Ms. Peterson had failed to follow through with appointments or referrals, so she was discharged from treatment.

Ms. Peterson returned to Valley Mental Health on June 17, 2002, indicating she needed medication.  She also requested a letter to give to the court for a pending legal matter, but refused to provide further details.  At this time, Ms. Peterson claimed to only be taking pain medications prescribed by a dentist.  Ms. Peterson next returned to Valley Mental Health on July 23, 2002, complaining of feeling overwhelmed.  On July 30, 2002, Ms. Peterson asked for a letter supporting her desire to break her apartment lease.  Then, on August 12, 2002, Ms. Peterson

---

[11] *Id.* at 334.

[12] *Id.* at 268.

explained her lawyer may be calling because "he thinks I am a lot sicker than you do."[13]

On November 18, 2002, Gregory Porter, M.S.W. Intern, completed a medical report noting that Ms. Peterson was goal-directed, concentrated well, and had concrete thoughts. Mr. Porter also noted that Ms. Peterson had poor judgment regarding relationships. Mr. Porter recorded that Ms. Peterson claimed to seclude herself from others and claimed to suffer from visual hallucinations. He wrote that Ms. Peterson was not taking any medication. Mr. Porter ultimately found Ms. Peterson's prognosis to be poor, based on her history and "low motivation."[14]

On November 27, 1999, physicians at Disability Determination Services completed a psychiatric review form, considering sections 12.04, 12.08, and 12.09 of the Listings. Ultimately, Ms. Peterson was found to face moderate limitations in her ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual with customary tolerances; work with others without being distracted by them; complete a normal workday or workweek without interruption from psychological symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to work setting changes; and set realistic goals

---

[13] *Id.* at 467.

[14] *Id.* at 515.

or plans independently of others.

In two later evaluations, Ms. Peterson was found to be either markedly or moderately limited in many of the same areas. For instance, on April 2, 2001, M. Egan, M.D., a state agency medical consultant, assessed Ms. Peterson's residual functional capacity. He found Ms. Peterson could not maintain attention or concentration for extended periods, perform activities within a schedule, maintain an ordinary routine, or complete a normal workweek. Dr. Egan gave no credence to the opinions of Dr. McGill and Dr. Heinbecker that Ms. Peterson was uncooperative and malingering. Then, on November 2, 2001, Dr. Egan opined that Ms. Peterson faced only moderate limitations in her ability to understand and remember, maintain concentration and persistence, interact socially, and adapt.

On June 21, 2001, William McCaw, M.D., from the Office of Disability, reviewed the medical evidence. He concluded that it revealed "a pattern of activity consistent with false statements by the claimant with reference to her disability that makes her claims of disability completely not credible."[15]

Six months after the end date at issue here (June 27, 2002), physicians at Disability Determinations Services found that Ms. Peterson met Listing § 12.04 (affective disorders). At this time, she was found to be markedly limited in her activities of daily living, maintenance of social functioning, and maintenance of concentration, persistence, or pace. Further, she was found to have suffered extended episodes of decompensation.

---

[15] *Id.* at 380.

In 2004, Ronald Houston, Ph.D. answered interrogatories regarding Ms. Peterson's psychological impairments during the relevant time period.  Dr. Houston opined that her impairments, singly or in combination, failed to meet or equal the requirements in the Listings of Impairments, specifically those of § 12.04 (affective disorders), § 12.06 (anxiety-related disorders), and § 12.08 (personality disorders).  Dr. Houston reported that Ms. Peterson's daily activities were moderately restricted; she faced moderate difficulty maintaining social functioning and concentrating; her persistence or pace was moderately limited; and there was insufficient evidence to assess deterioration or decompensation.

2.      *Benefits Process*

In 2000, Ms. Peterson filed an application for disability insurance benefits and supplemental security income under the Social Security Act, alleging disability due to severe depression, back pain, and hip pain.  Her applications were denied initially and upon reconsideration in an opinion dated June 27, 2002.  Ms. Peterson requested, and was granted, Appeals Council review of the decision.  The Appeals Council remanded the case to the ALJ for further development.  On October 1, 2003, at the administrative hearing on remand, Ms. Peterson's attorney stipulated to a revised claim for a closed period of disability, from November 1, 2000, to June 27, 2002, because Ms. Peterson had been awarded benefits pursuant to a later application, with an onset date of June 28, 2002.  Ultimately, the ALJ determined Ms. Peterson was not disabled during the closed period because her residual functional capacity would have allowed her to perform sedentary work with additional restrictions.  The Appeals Council declined to review this determination, making the ALJ's determination the Commissioner's final

decision.

At the benefits hearing on October 1, 2003, Ms. Peterson testified to an inability to remember anything that happened from November 1, 2002, through June 28, 2002. After Ms. Peterson testified, the ALJ heard testimony from John Hurst, a vocational expert. Mr. Hurst identified Ms. Peterson's past relevant work positions and testified to the transferrable skills Ms. Peterson acquired in those positions. Also, Mr. Hurst worked through several hypothetical situations relating to an individual's ability to perform work when faced with certain limitations. Ultimately, Mr. Hurst identified telephone answering service operator, clerical appointment clerk, and clerical sorter as available jobs for a person with Ms. Peterson's limitations and retained skills.

After hearing all the evidence, the ALJ issued his findings. Using the five-step sequential evaluation process,[16] the ALJ found Ms. Peterson suffered from a severe impairment, but she was not disabled for purposes of the Social Security Act.

Specifically, at step one, the ALJ found that Ms. Peterson had not performed any substantial gainful activity from the closed period of November 1, 2000, to June 27, 2002. At step two, the ALJ found that the objective medical evidence established that Ms. Peterson had medically-determinable severe impairments of sufficient duration to limit Ms. Peterson's ability to perform basic work activities. Specifically, the ALJ found Ms. Peterson suffered from the impairments of: an affective/mood disorder, degenerative joint disease of the knees, a depressive

---

[16] *See* 20 C.F.R. § 404.1520; *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

disorder, post traumatic stress syndrome, and alcohol dependence (in remission).  At step three, the ALJ concluded Ms. Peterson's severe impairments, alone or in combination, failed to meet or equal any impairment in the Listing of Impairments under Appendix 1 of the regulations.[17] Specifically, the ALJ found that Ms. Peterson's conditions failed to meet or equal Listings § 1.02, § 12.04, or § 12.06.

At step four, the ALJ analyzed Ms. Peterson's residual functional capacity and determined that Ms. Peterson could perform a full range of sedentary work, limited by the inability to: lift more than five to eight and one half pounds at a time; lift or carry articles weighing more than two to three pounds occasionally; stand or walk more than fifteen minutes at a time or two hours in an eight-hour day; sit more than forty-five minutes a time or more than six hours in an eight-hour day; work at more than the low end of the semi-skilled level; work on the floor; climb stairs; work around dangerous heights, machinery, or chemicals; work at more than a low stress level (low production rate, low concentration level, low memory level, only work with the public by phone, minimal supervision, minimal interaction with coworkers, minimal work setting changes).  The ALJ found Ms. Peterson unable to perform any of her prior relevant work.

At step five, based upon the testimony of Mr. Hurst, the ALJ determined Ms. Peterson could perform work that existed in significant numbers in the national economy.  Therefore, the ALJ found Ms. Peterson to be not disabled within the meaning of the Social Security Act during the relevant time period.  This became the Commissioner's final decision.

---

[17] *See* 20 C.F.R. § 404.1520(d).

**STANDARD OF REVIEW**

The standard of review for social security challenges is set forth in 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."[18]  In other words, the court reviews the Commissioner's decision to ascertain whether it is supported by substantial evidence in the record and to evaluate whether the ALJ applied the correct legal standards.[19]  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]  The court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[21]  However, the court does not "reweigh the evidence or substitute [its] judgment for the Commissioner's."[22]

**DISCUSSION**

To clarify, the only issues before this court are whether substantial evidence supports the Commissioner's conclusion that Ms. Peterson was not disabled within the meaning of the Social Security Act during the closed period of November 1, 2000, to June 28, 2002, and whether the

---

[18] 42 U.S.C. § 405(g).

[19] *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *see also Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[20] *Grogan*, 399 F.3d at 1261.

[21] *Id.* at 1262.

[22] *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).

Commissioner applied the correct legal standards in reaching this conclusion.  The court finds

the ALJ's findings to be supported by substantial evidence and free from legal error.

The Social Security Administration is authorized to pay disability insurance benefits only

to persons who have a "disability," as defined by the Social Security Act.  A person is disabled

only if his "physical or mental impairment or impairments are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."[23]

In order to determine whether a Social Security claimant is disabled, the Commissioner

has developed a five-step evaluation.[24]  The claimant bears the burden of proof for steps one

through four, and if the claimant fails to meet this burden, consideration of any subsequent steps

is rendered unnecessary.[25]  As the Tenth Circuit explained in *Fischer-Ross v. Barnhart*:[26]

> Step one requires a claimant to establish she is not engaged in "substantial gainful
> activity."  Step two requires the claimant to establish she has a "medically severe
> impairment or combination of impairments."  Step three asks whether any "medically
> severe impairment," alone or in combination with other impairments, is equivalent
> to any of a number of listed impairments so severe as to preclude "substantial gainful
> employment."  If listed, the impairment is conclusively presumed disabling.  If
> unlisted, the claimant must establish at step four that her impairment prevents her
> from performing work she has previously performed.  If the claimant is not
> considered disabled at step three, but has satisfied her burden of establishing a prima
> facie case of disability under steps one, two, and four, the burden shifts to the
> Commissioner to show the claimant has the residual functional capacity (RFC) to

---

[23] 42 U.S.C. § 423(d)(2)(A).

[24] *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988).

[25] *Williams*, 844 F.2d at 750.

[26] 431 F.3d 729 (10th Cir. 2005).

perform other work in the national economy in view of her age, education, and work experience.[27]

In this case, Ms. Peterson makes four specific claims of error: (1) the ALJ improperly discounted the opinions of two physicians; (2) the ALJ improperly evaluated Ms. Peterson's credibility; (3) the ALJ erroneously assessed Ms. Peterson's residual functional capacity, and (4) the ALJ failed to meet his burden of proof at step five.  The Commissioner counters that the ALJ decided properly.  A review of the record and the ALJ's decision reveals that his findings as to Ms. Peterson's impairments and ability to work are supported by substantial evidence in the record.  The court addresses each claim of error in turn.

1.    *The ALJ's Discounting of Physician Opinions*

In her first claim of error, Ms. Peterson argues the ALJ wrongly discounted the opinions of Dr. McDonald, Dr. McQueen, and Nurse Little.  But the court finds the ALJ properly discounted these opinions.

An ALJ must specifically articulate the basis for discounting a treating physician's opinion.[28]  However, "[a] physician's opinion is . . . not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source."[29]  Further, an ALJ can completely reject a treating physician's opinion as long as he

---

[27] *Id*. at 731 (citations and internal quotations omitted).

[28]  *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (citing *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)); *see also* 20 C.F.R. 404.1527.

[29] *Doyal*, 331 F.3d at 763.

provides specific, legitimate reasons and rejects it "'on the basis of contradictory medical

evidence and not due to his or her own credibility judgments, speculation or lay opinion.'"[30]  In

other words, only if the opinion is consistent with other substantial evidence in the record is the

ALJ required to give it controlling weight.[31]  Additionally, the ALJ weighs medical reports using

specific criteria, including the nature and extent of the treatment relationship, any supporting

evidence, consistency with other opinions, and whether the doctor is a specialist.[32]

In this case, the ALJ was justified in dismissing the opinions of Nurse Little, Dr.

McQueen, and Dr. McDonald.  With regard to Nurse Little, the ALJ had no obligation to afford

her opinions any weight because a nurse practitioner is (at least under the regulations) not

considered an "acceptable medical source[]."[33]  Instead, a nurse practitioner is an "other" source

from which the ALJ *may*, but is not required, to draw.[34]  Further, Nurse Little's reports and letters

contained no treatment notes or objective test results, and her contact with Ms. Peterson was

quite limited.  In other words, she had not seen the claimant "a number of times and long enough

to have obtained a longitudinal picture of [the claimant's] impairment.'"[35]   Thus, the ALJ was

---

[30] *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)).

[31] *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).

[32] *See* 20 C.F.R. § 404.1527.

[33] *Id.* § 404.1513(a).

[34] *Id.* § 404.1513(d).

[35] *Id.* § 416.927(d)(2)(i).

entirely justified in disregarding her opinion.

Similarly, the ALJ was justified in dismissing the conclusions of Dr. McQueen and Dr. McDonald regarding Ms. Peterson's functional limitations, because of the unsupported nature of the doctors' findings.  "A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including . . . any physical or mental restrictions," but the ALJ will only "give controlling weight to that opinion if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record."[36]  Here, the ALJ rejected the opinions based on the lack of consistency with the other medical evidence — a specific and legitimate ground.

The ALJ correctly noted that neither doctor's conclusions about Ms. Peterson's inability to work were supported by the evidence in the record.  Indeed, Dr. McQueen's own treatment notes contradict his conclusions with regard to Ms. Peterson's disability status.  Dr. McQueen found that x-rays of Ms. Peterson's knees were largely normal, and only recommended she start exercising.  And Dr. McDonald's opinion is unsupported by evidence.  For instance, he indicated an MRI of Ms. Peterson's left knee showed extensive problems, but his finding is unconvincing because no supporting MRI was introduced into evidence.  In addition, Ms. Peterson only saw Dr. McDonald three times, and one time was simply to request that Dr. McDonald fill out disability paperwork for her.

The medical evidence as a whole further supports the ALJ's decision to discount Dr.

---

[36] *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

McQueen's and Dr. McDonald's disability opinions.  Contrary to their opinions, the record

evidence suggests Ms. Peterson's knee impairments were not of disabling severity.  For example,

multiple x-rays of Ms. Peterson's knees showed only early degenerative changes and minimal

joint narrowing.  Two MRI's revealed these same findings, in addition to a meniscus tear.  These

relatively limited findings fail to support Ms. Peterson's (or her doctors') claims of disabling

impairment.  Ms. Peterson wholly fails to show how these medical opinions are consistent with

the objective medical evidence.

Ms. Peterson also claims the ALJ erred in discounting these opinions because it is the

ALJ's responsibility to recontact a medical source if the information from that source is

inadequate to determine if a claimant is disabled.  But the court fails to see the relevance of this

argument — there is no question of the adequacy of the information from any of these sources.

The ALJ questioned only the validity and evidentiary bases of the opinions.  The information was

more than adequate for the ALJ to determine Ms. Peterson was not disabled in light of the

objective medical evidence.

In sum, because the opinions of Dr. McQueen and Dr. McDonald are thoroughly

inconsistent with other substantial evidence in the record , the ALJ properly rejected them.

Additionally, the ALJ had no duty to consider Nurse Little's opinion because she was a nurse

practitioner, had no objective findings to support her opinion, and had extremely limited contact

with Ms. Peterson.  Considering this in light of the court's deference to the judgment of the ALJ

in weighing the evidence and resolving conflicts,[37] the court holds the ALJ was justified in dismissing these opinions.

2.      *The ALJ's Assessment of Ms. Peterson's Credibility*

Next, Ms. Peterson argues the ALJ's credibility assessment is flawed, constituting legal error. Specifically, Ms. Peterson argues that the ALJ improperly based his credibility determination on Ms. Peterson's failure to pursue treatment and that he failed to connect his credibility determination to the evidence. The court finds the ALJ considered the substantial evidence properly and correctly applied the law.

Courts give great deference to an ALJ's conclusions regarding a claimant's credibility because such determinations are based on personal observations made by the ALJ as the trier of fact.[38] Thus, the ALJ's credibility determinations are generally considered binding on the reviewing court.[39] Nevertheless, findings as to credibility should be closely linked to substantial evidence and not conclusory.[40] The Tenth Circuit has enumerated factors relevant to an ALJ's assessment of credibility; they are: (1) the levels of medications used by the claimant and their effectiveness, (2) the extensiveness of the claimant's attempts (medical or non-medical) to obtain

---

[37] *See Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

[38] *Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir. 1987) (citing *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983)).

[39] *See Broadbent*, 698 F.2d at 413–14; *Cooley v. Weinberger*, 518 F.2d 1151, 1155–56 (10th Cir. 1975).

[40] *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).

relief, (3) the frequency of the claimant's medical contacts, (4) the nature of the claimant's daily activities, (5) subjective measures of credibility that are peculiarly within the judgment of the ALJ, (6) the motivation of and relationship between the claimant and other witnesses, and (7) the consistency or compatibility of non-medical testimony with objective medical evidence.[41] Finally, an ALJ must set forth specific evidence upon which he relies in evaluating a claimant's credibility.[42]

Ms. Peterson first objects to the ALJ's reference to her noncompliance with treatment in the credibility determination.  Specifically, Ms. Peterson argues that to properly consider her noncompliance, the ALJ must utilize the four factors identified in *Teter v. Heckler*:[43]  (1) the treatment at issue should be expected to restore the claimant's ability to work, (2) the treatment must have been prescribed, (3) the treatment must have been refused, and (4) the refusal must have been without justifiable excuse.[44]  The flaw in Ms. Peterson's argument is that the *Teter* factors apply only when courts rely on a claimant's failure to take medication as a basis for denying disability benefits.

In this case, the ALJ did not base his disability determination or denial of benefits on Ms. Peterson's compliance with treatments, so an analysis of the *Teter* factors was unnecessary.  In

---

[41] *Id.* at 1132.

[42] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (citing *Kepler v. Chater*, 68 F.3d 387, 390-91 (10th Cir. 1995)).

[43] 775 F.2d 1104 (10th Cir. 1985).

[44] *Id.* at 1107.

*Qualls v. Apfel*,[45] the Tenth Circuit found the *Teter* factors to be inapplicable because in *Qualls*, the ALJ had used the petitioner's failure to take medications in his credibility determination, but not as a basis for denying benefits for failure to follow prescribed treatment.  In other words, the ALJ only considered the medication use to assess "what attempts plaintiff made to relieve his pain — including whether he took pain medication — in an effort to evaluate the veracity of plaintiff's contention that his pain was so severe as to be disabling."[46]

Similarly, in this case, the ALJ did not base his residual functional capacity evaluation or his denial of benefits on Ms. Peterson's non-cooperation with treatment.  Instead, the ALJ only considered Ms. Peterson's failure to comply with treatment insofar as it related to her credibility. For instance, he determined that "[i]f the claimant were truly experiencing disabling symptoms, then it would be reasonable to expect that she would have complied with the forms of treatment offered during the relevant time period."[47]  Because the ALJ only considered Ms. Peterson's failure to seek treatment with regard to Ms. Peterson's credibility, the ALJ committed no legal error by not addressing the *Teter* factors.

Ms. Peterson also claims the ALJ improperly discounted her credibility due to her lack of memory.  In her testimony, Ms. Peterson denied memory of the time period at issue, despite repeated attempts to refresh her memory.  Consequently, the ALJ also considered Ms. Peterson's

---

[45] 206 F.3d 1368 (10th Cir. 2000).

[46] *Id.* at 1372.

[47] R. 27.

testimony at the previous hearing, thinking it to be more reliable since it was given closer to the time period at issue.  But even at the first hearing, Ms. Peterson's testimony was very vague.  And contrary to Ms. Peterson's claim, the ALJ did not discount Ms. Peterson's credibility based on this lack of memory alone.  Rather, the ALJ pointed out that Ms. Peterson's claimed limitations were inconsistent with the objective medical evidence as a whole.  Further, the ALJ noted that at both hearings, Ms. Peterson was unwilling (not *unable*) to make any effort to answer the questions.  This conclusion is consistent with the numerous medical reports regarding Ms. Peterson's noncompliance with treatment and inconsistent claims.  Multiple medical caregivers remarked on such things as Ms. Peterson's tendency to malinger, her inconsistencies, and her non-cooperation.[48]  Therefore, the ALJ's credibility determination was well-grounded, fully supported by the record, and legally proper.

*3.*     *The ALJ's Residual Functional Capacity Determination.*

Next, Ms. Peterson objects to the ALJ's conclusions regarding her residual functional capacity.  Specifically, Ms. Peterson claims the ALJ failed to include Ms. Peterson's mental limitations in his determination, and that his conclusions were unsupported.  Neither claim has merit.

At step four, the ALJ first found Ms. Peterson's residual functional capacity to prohibit her from lifting more than five to eight and one half pounds at a time; lifting or carrying articles weighing two to three pounds occasionally; standing or walking more than fifteen minutes at a

---

[48] *See, e.g.*, R. 215, 224, 232, 234–35, 263, 268, 298, 341, 334–35, 345, 347, 457, 467–69, 471, 515.

time or more than two hours in an eight-hour workday; sitting more than forty-five minutes at a time or more than six hours in an eight-hour workday; work at more than the low end of the semi-skilled level; work on the floor; climbing more than a few steps; working in dangerous conditions; and work at more than a low stress level.  But these limitations, according to the ALJ, would not prevent Ms. Peterson from performing some unskilled, sedentary work available in the national economy.  The court finds this determination to be well-supported by the evidence in the record.  That Ms. Peterson was found to be disabled as of June 28, 2002, in a later application, does not mean she was disabled from November 1, 2000, through June 28, 2002.  To prevail here, Ms. Peterson needed to show her condition was so limiting *during this period* as to prevent substantial gainful activity.  Ms. Peterson has not done so.

The ALJ thoroughly discussed the record evidence before finding Ms. Peterson capable of performing a range of sedentary work.  In other words, the ALJ was anything but conclusory.  The evidence presented to the ALJ regarding Ms. Peterson's physical problems revealed little more than subjective complaints, some knee problems, other degeneration, and some mental limitations.  Before the ALJ can consider subjective allegations of pain, "the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain."[49]  Ms. Peterson failed to do so.  And she points to no reliable evidence supporting her contention that her actual capabilities were less than those outlined in the ALJ's assessment.  For instance, even though Ms. Peterson's knee

---

[49] *Branum v. Barnhart*, 385 F.3d 1268, 1273 (10th Cir. 2004).

problems were largely untreated, her examination revealed only relatively insignificant impairment.  As discussed before, only Dr. McDonald and Dr. McQueen indicated Ms. Peterson's knee problems may be a major limiting issue, and the ALJ properly discounted their opinions.

Also, none of the medical opinions that warranted significant weight placed restrictions on Ms. Peterson's activities or opined that she was disabled.  While this alone is not dispositive, it supports a finding Ms. Peterson is not disabled.[50]

Additionally, at one point, Ms. Peterson claims the ALJ failed to consider Ms. Peterson's mental limitations with regard to the residual functional capacity determination.[51]  But in the next breath, Ms. Peterson concedes the ALJ did consider Ms. Peterson's mental impairments.[52]  The record shows the ALJ considered Ms. Peterson's mental health in some detail, summarizing Ms. Peterson's entire mental health history.  However, the ALJ partially discounted the severity of Ms. Peterson's claimed mental health limitations, referring to Ms. Peterson's inconsistent statements and the conclusions of Dr. Houston regarding the moderate nature of Ms. Peterson's difficulties.  The ALJ then incorporated his findings into his RFC determination, indicating that Ms. Peterson could only work at a low stress level, low concentration level, and low memory level.  In other words, the ALJ properly incorporated Ms. Peterson's mental impairments.

---

[50] *See Kelley*, 62 F.3d at 338; *Ray v. Bowen*, 865 F.2d 222, 226 (10th Cir. 1989).

[51] Pl.'s Opening Brief 24 (Docket No. 9).

[52] *Id.* at 28.

Ms. Peterson also claims that the ALJ's residual functional capacity determination is erroneous because the ALJ improperly discounted Ms. Peterson's credibility. But the court has already found the ALJ's credibility determination to be proper. In sum, substantial evidence supports the ALJ's residual functional capacity determination, and it was legally correct.

4.      *The ALJ's Assessment at Step Five*

In her last claim of error, Ms. Peterson argues the ALJ's finding that Ms. Peterson could do some sedentary work contradicts his residual functional capacity determination. In other words, Ms. Peterson claims the limitations recognized by the ALJ foreclose sedentary work.

For example, Ms. Peterson argues the ALJ's findings that Ms. Peterson could only work at a low concentration level and low memory level are inconsistent with a finding that Ms. Peterson could work as a clerical sorter because the definition of a clerical sorter includes the ability to apply common sense and carry out instructions. Ms. Peterson claims the ALJ erred by not eliciting an explanation from the vocational expert regarding this conflict. But Ms. Peterson's argument assumes the positions cited by the vocational expert are inconsistent with Ms. Peterson's residual functional capacity — Ms. Peterson has not established this. Indeed, the record shows otherwise. The ALJ found Ms. Peterson suffered only moderate limitations, not marked limitations, as Ms. Peterson contends, and the ALJ incorporated these limitations into his hypothetical accurately. Therefore, the ALJ could legitimately rely on Mr. Hurst's response as a basis for finding Ms. Peterson was not disabled.

Ms. Peterson also argues the ALJ's finding that Ms. Peterson could do sedentary work

was wrongful because sedentary work requires the claimant to lift no more than ten pounds,[53] but the ALJ found Ms. Peterson could only lift five to eight and one half pounds at a time.  Although the ALJ did not ask Mr. Hurst if his testimony comported with the job descriptions contained in the DOT,[54] Ms. Peterson points no evidence that Mr. Hurst's testimony conflicted with the job descriptions.  Ms. Peterson simply fails to establish that the specific positions of telephone service operator, clerical appointment clerk, or clerical sorter involve activities Ms. Peterson is incapable of doing.  Instead, Ms. Peterson cites only to the requirements for sedentary work generally.

Similarly, Ms. Peterson claims conflict exists in Mr. Hurst's opinion because sedentary work requires an ability to sit for at least six hours in an eight-hour day but the ALJ found that while Ms. Peterson could sit for six total hours, she needed to alternate between sitting and standing.  Ms. Peterson claims this runs contrary to the social security rulings, which say that a person who must alternate between sitting and standing is not capable of doing either for the prolonged times needed for sedentary work.[55]  But Ms. Peterson misrepresents this ruling — all it requires is for the ALJ to consult a vocational expert in the event that a residual functional capacity determination differs from the definitions of a work range so much that it might erode the occupational base.  The ALJ clearly met this requirement in this case.  He accurately detailed

---

[53] *See* 20 CFR § 404.1567(a).

[54] *See Frazee v. Barnhart*, 259 F. Supp. 2d 1182, 1198 (D. Kan. 2003).

[55] *See* Social Security Ruling 83-12.

Ms. Peterson's limitations, then Mr. Hurst used his expertise to find jobs within the sedentary range open to Ms. Peterson.

The court also notes that any error by the ALJ in this regard was harmless error because it had no significant effect on the outcome.[56]  Accordingly, the court finds the ALJ's step five assessment to be supported by substantial evidence and free from legal error.

### CONCLUSION

This court finds substantial evidence in the record to support the ALJ's final ruling and affirms the ruling as legally correct.  Accordingly, the court upholds the Commissioner's decision denying disability insurance and social security insurance benefits to Ms. Peterson during the relevant time period, and denies Ms. Peterson's request to reverse the decision or remand the case.  The Clerk of the Court is directed to close the case.

DATED this 1st day of August, 2007.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[56] *See St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 691 (10th Cir. 2002); *United States v. Wacker*, 72 F.3d 1453, 1473 (10th Cir. 1995).